UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PENSION PLAN FOR PENSION TRUST FUND FOR OPERATING ENGINEERS, et al., <br><br> Plaintiffs, <br><br> v. <br><br> GIACALONE ELECTRICAL SERVICES, INC, et al., <br><br> Defendants. | Case No. 13-cv-02338-SI <br><br> **ORDER RE: CROSS MOTIONS FOR SUMMARY JUDGMENT; DEFAULT JUDGMENT; MOTION TO SEAL** <br><br> Re: Dkt. Nos. 85, 88, 89, 93 |

On June 26, 2015, the Court heard argument on the parties' cross motions for summary judgment, plaintiffs' motion for default judgment, and the parties' motion to seal. For the reasons stated below, the Court **GRANTS** the Giacalones' motion for summary judgment, **DENIES** plaintiffs' motion for summary judgment, **GRANTS** plaintiffs' motion for default judgment, and **GRANTS** the parties' motion to seal.

**BACKGROUND**

Plaintiffs, Pension Plan for Pension Trust Fund for Operating Engineers ("the Plan"), and Richard Piombo and Russell Burns (as trustees), bring this action against defendants Giacalone Electrical Services, Inc. ("GES"), and Lisa and Vincent Giacalone ("the Giacalones") alleging violations of the Employment Retirement Income Security Act of 1974 ("ERISA"). During all relevant times, GES was a corporation engaged in the construction business, and an "employer" in an industry "affecting commerce" as defined by ERISA. 29 U.S.C. §§ 1002(5), 1002 (11)-(12). During all relevant times, the Giacalones were the sole shareholders of GES. Docket No. 86, V. Giacalone Decl. ¶ 4; Stipulation of Undisputed Facts ("SUF") ¶ 3. Between 2002 and 2009, GES made contributions to the Plan as required by a collective bargaining agreement with the union representing its employees. V. Giacalone Decl. ¶ 4; SUF ¶ 1. However, in 2009, its employees

voted to oust their union in an effort to obtain better representation; GES was therefore required to cease recognizing the former union, and accordingly, withdrew from the Plan. V. Giacalone Decl. ¶ 6; SUF ¶ 1. On November 7, 2012, GES and its control group members were assessed with withdrawal liability of $2,231,762. SUF ¶ 2. In 2010, GES went out of business, in part due to the change in union representation of its employees. V. Giacalone Decl. ¶ 6. GES's corporate status is currently suspended, and its contractor's license has expired. Babu Decl. Exhs. A, B.

In 2004, the Giacalones purchased a vacation home in Incline Village Nevada ("the Property") for $3.36 million dollars, which they eventually hoped to retire in. V. Giacalone Decl. ¶¶ 8-9; SUF ¶¶ 4-5. The Giacalones leased the Property from time to time in order to defray the cost of the mortgage, and related expenses. However, the parties dispute whether the Property should be characterized as a passive investment, or as a profit-seeking business.

On May 22, 2013, plaintiffs filed this action in federal court, alleging causes of action for (1) withdrawal liability (against all defendants), (2) reimbursement for distributions received from a dissolved corporation (against the Giacalones), and (3) failure to provide required information (against all defendants). Docket No. 1, Complaint. In the ensuing months, plaintiffs reached settlements or voluntarily dismissed many of the named defendants. *See* Docket Nos. 39, 49. The present motions only concern defendants GES and the Giacalones. On July 29, 2013, the Giacalones answered the complaint. Docket No. 17. GES failed to respond, or otherwise appear in this case; accordingly, on August 21, 2013, the Clerk entered default against GES. Docket No. 23. Now before the Court are cross motions for summary judgment filed by the Plan and the Giacalones, and a motion for default judgment filed by the Plan against GES. Docket Nos. 85, 88, 89.

## LEGAL STANDARD

Summary judgment is proper if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Rosenbaum v. Washoe Cnty.*, 663 F.3d 1071, 1075 (9th Cir. 2011); Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material

fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party, however, has no burden to disprove matters on which the non-moving party will have the burden of proof at trial. The moving party need only demonstrate to the Court that there is an absence of evidence to support the non-moving party's case. *Id*. at 325.

Once the moving party has met its burden, the burden shifts to the non-moving party to "set out 'specific facts showing a genuine issue for trial.'" *Id*. at 324 (quoting then-Fed. R. Civ. P. 56©). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

In deciding a summary judgment motion, the court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Id*. at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." *Id*. However, conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). The evidence the parties present must be admissible. Fed. R. Civ. P. 56(c)(2).

**DISCUSSION**

**I.     Cross Motions for Summary Judgment**

The Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA") amended ERISA and was enacted to reduce the incentive for employers to terminate their affiliation with multiemployer pension plans. *H.C. Elliott, Inc. v. Carpenters Pension Trust Fund*, 859 F.2d 808, 810 (9th Cir. 1988). The MPPAA imposes withdrawal liability on an "employer" which withdraws from a multiemployer pension plan. *Resilient Floor Covering Pension Fund v. M&M Installation, Inc.*, 630 F.3d 848, 851 (9th Cir. 2010) (citing 29 U.S.C. § 1381). The MPAA defines "employer"

to include, not only the entity making contributions to the plan, but also all "trades or businesses (whether or not incorporated) which are under common control" with the contributing employer. 29 U.S.C. § 1301(b)(1). Therefore, all "trades or businesses" under "common control" are jointly and severally liable for all such employers' withdrawal liability. *See Bd. of Trs. of W. Conference of Teamsters Pension Trust Fund v. Lafrenz*, 837 F.2d 892, 893 (9th Cir. 1988); *Auto. Indus. Pension Trust Fund v. Fitzpatrick Chevrolet Inc.*, 833 F. Supp. 2d 1162, 1164 (N.D. Cal. 2011); *see also Cent. States, Se. & Sw. Areas Pension Fund v. Fulkerson*, 238 F.3d 891, 894-95 (7th Cir. 2001) ("[T]o impose withdrawal liability on an organization other than the one obligated to the fund, two conditions must be satisfied: (1) the organization must be under common control with the obligated corporation; and (2) it must be a trade or business.").

### A. Trade or Business

Plaintiffs argue that the Property constitutes such a trade or business under common control of GES–the withdrawing employer–and thus wish to assess withdrawal liability against the Giacalones as sole proprietors of the Property. The Giacalones concede that the Property is under "common control," but dispute that it constitutes a "trade or business" as defined by Section 1301(b)(1). SUF ¶ 3; Docket No. 85, Def. Mot at 5.

"ERISA does not contain a definition of the term 'trade or business.'" *Carpenters Pension Trust Fund for N. Cal. v. Lindquist*, 2011 U.S. Dist. LEXIS 78193, at *12 (N.D. Cal. Jul. 19, 2011), *aff'd* 491 Fed. App'x 830 (9th Cir. 2012). Section 1301(b)(1) provides that the phrase "trades or businesses (whether or not incorporated) which are under common control" has the same meaning as that provided in the regulations promulgated under section 414(c) of the Internal Revenue Code. *Lafrenz*, 837 F.2d at 894 n.6. "However, 'trade or business' is not clearly defined in either section 414(c) or the regulations promulgated thereunder." *Lindquist*, 2011 U.S. Dist. LEXIS 78193, at *12.

The Ninth Circuit has provided little guidance as to what qualifies as a "trade or a business" except to state that it is essentially a factual inquiry. *Lafrenz*, 837 F.2d at 894 n.6 (holding that a truck leasing operation constituted a "trade or business"); *see also Lindquist*, 2011

4

U.S. Dist. LEXIS 78193, at *12-20 (holding that a leasing arrangement between the defendant and the withdrawing entity constituted a "trade or business"). This factual inquiry should be guided by Congress' intent in enacting Section 1301(b)(1), which was "to prevent businesses from shirking their ERISA obligations by fractionalizing operations into many separate entities." *Teamsters Pension Trust Fund-Bd. of Trustees of W. Conference v. Allyn Transp. Co.*, 832 F.2d 502, 507 (9th Cir. 1987) (citing *Board of Trustees v. Johnson, Inc.,* 830 F.2d 1009, 1013 (9th Cir.1987)); *see also Lafrenz*, 837 F.2d at 894 ("The point of section 1301(b)(1) is simply to prevent the controlling group…from avoiding withdrawal liability by shifting corporate assets into other business ventures under its control.").

While the determination of whether an entity constitutes a "trade or business" will depend on the facts and circumstances of each case, three guiding principles have emerged from the case law. First, courts generally find that an entity is a "trade or business" where it is engaged in economic activity with the withdrawing employer. *See Lindquist*, 491 F. App'x 830, 831 (9th Cir. 2012); *Cent. States S.E. & S.W. Areas Pension Fund v. Ditello*, 974 F.2d 887, 890 (7th Cir.1992) ("Federal courts reaching this issue, including this circuit, have uniformly held that leasing property to a withdrawing employer is a 'trade or business' for purposes of section 1301(b)(1)."); *Bd. of Trustees, Sheet Metal Workers' Nat. Pension Fund v. Delaware Valley Sign Corp*., 945 F.Supp.2d 649, 653 (E.D.V.A. 2013) ("Although the Fourth Circuit has not yet addressed this issue, those circuit and district courts that have done so are in accord that renting property to a withdrawing employer is categorically a trade or business.") (internal quotation marks and modifications omitted). However, while the existence of an economic nexus is sufficient to confer "trade or business" status, it is by no means necessary. *Lafrenz* 837 F.2d at 895 ("section 1301(b)(1) does not require that commonly controlled businesses be economically related."). Second, "the statute does not distinguish between active and passive investments." *Id.* at 894. Therefore, merely characterizing an entity as "passive" in nature does not necessarily render it beyond Section 1301(b)(1)'s ambit. *Id.* at 894, nt. 7. Third, "[t]he mere ownership of property without more is insufficient to constitute a 'trade or business.'" *Pac. Coast Shipyards Pension Fund v. Nautical Eng'g, Inc.*, No. 12-05439 RS, 2014 WL 120637, at *3 (N.D. Cal. Jan. 13, 2014)

(citing *Pension Plan for Pension Trust Fund for Operating Engineers v. Galletti Concrete, Inc.*, 2013 WL 5289017, *4 (N.D. Cal.2013)). With these precepts in mind, the Court now turns to the facts of this particular case to determine whether the Property constitutes a "trade or a business."

The Giacalones purchased the Property in 2004 for $3.36 million dollars to use as a vacation home and serve as their eventual retirement home. V. Giacalone Decl. ¶ 9. In late 2004 or early 2005, the Giacalones befriended Terry Barbery, a handy man and resident of Incline Village since 2000. Barbery Decl. ¶ 1; V. Giacalone Decl ¶ 10. The Giacalones hired Barbery, who assisted them in making substantial repairs to the Property over several years. V. Giacalone Decl ¶ 10. These repairs included replacing a "ruined" carpet with hardwood floors, resurfacing the deck, replacing the irrigation system, some painting, as well as other "maintenance and remodeling." *Id.* Approximately a year after Barbery met the Giacalones, he suggested that they might consider renting out the Property to defray the costs of ownership. *Id.*; Barbery Decl. ¶ 2. The Giacalones agreed, and began renting the Property in 2006. They employed Barbery to let guests in and out, and to hire cleaners. Barbery Decl. ¶ 3; V. Giacalone ¶ 10. In July of 2010, Barbery began advertising the Property as a vacation rental online. *Id.*

The Property produced $49,500, $65,074, $26,504, $41,000, and $58,625 in rental income in 2006, 2007, 2008, 2009, and 2010, respectively. V. Giacalone Decl. Exhs. 5-10. From 2006 through 2009, the annual mortgage expense was $170,363, and in 2010 it was $220,822. Giacalone Decl. Exhs. 4, 11. The effect of the sizeable mortgage payment, in addition to taxes and upkeep, was to make the Property cash flow negative to the tune of hundreds of thousands a year. The Giacalones' Schedule E tax returns show that they claimed deductions for cleaning, insurance, mortgage, taxes, utilities, and depreciation. Babu Decl. Exh. D-F. The Giacalones also checked a box indicating that they had not used the Property for personal purposes for more than the greater of 14 days or 10 percent of the total days the property was rented at fair market value. *Id.*; see also Babu Decl. Exh. H, Giacalone Depo. at 218:17-23 (testifying to have used the Property for less than 14 days a year, and only 2 days in the first 10 months of 2013). However, in February of 2015, in the midst of this litigation, the Giacalones amended their returns to indicate that they had indeed used the Property for personal purposes for more than the greater of 14 days or 10 percent

of the total days the property was rented at fair market value.[1] From 2006 to through 2010, the Property was never rented more than 65 days in calendar year[2], and before the Property was advertised publicly in July of 2010, it was rented only to friends, family, and by word of mouth. V. Giacalone Decl. ¶¶ 10, 12. It is undisputed that the Property was never rented to GES.

In *Auto. Indus. Pension Trust Fund v. Tractor Equip. Sales, Inc.*, No. 13-CV-03703-WHO, 2014 WL 5810336 (N.D. Cal. Nov. 7, 2014), the court was presented with a set of facts very similar to the case at bar. The defendants, the Van Tuyls, owned a controlling interest in the withdrawing employer, TES. Plaintiffs attempted to argue that each of three properties that the Van Tuyls owned and leased constituted "trades or businesses" and were therefore subject to withdrawal liability. The Court found that none of the three properties constituted a trade or business and granted summary judgment in favor of the defendants.

One of these three properties, a residential property located in the Lake Tahoe area, bears considerable resemblance to the Property at issue in the present action. The Van Tuyls' Tahoe property was a single family residence, which they rented to friends and family, earning approximately twenty thousand dollars a year in rental income. *Id.* at *2. The Van Tuyls claimed tax deductions for travel expenses, insurance, utilities, gardening, and depreciation. *Id.* On their Schedule E Form, they indicated that they *had not* used the property for personal purposes for more than the greater of 14 days or 10 percent of the total days the property was rented at fair market value. *Id.* They reported 365 "fair rental days" and zero "personal use days." *Id.* They

---

[1] Plaintiffs argue that the Court should not rely on the amended tax returns as they were filed and produced only a month before the fact discovery cut-off, and caused plaintiff to suffer undue prejudice. Pl. Mot. at 4, nt. 1. While this about-face certainly creates an aura of unreliability, the Court can find no resultant prejudice which would justify disregarding the amended returns. Moreover, considering the evidence of the amended returns would not alter the Court's ultimate determination. *See Auto. Indus. Pension Trust Fund v. Tractor Equip. Sales, Inc.*, No. 13-CV-03703-WHO, 2014 WL 5810336 (N.D. Cal. Nov. 7, 2014) (finding that a leasing operation was not a "trade or business" even where defendants had indicated on their Schedule E that that they had not used the property for personal purposes for more than the greater of 14 days or 10 percent of the total days the property was rented at fair market value.).

[2] Plaintiffs dispute that the Property was rented for only 65 days a year, pointing to guest logs showing that it was rented for 82 days in 2011. Babu Decl. Exh. I. However, this fails to undermine the Giacalones assertion that *prior to* 2011, it was never rented more than 65 days.

engaged in very little maintenance or improvement of the property. *Id.* The Van Tuyls never leased the property to TES, the withdrawing employer. *Id.*

Plaintiffs attempt to distinguish *Tractor* on three grounds: (1) the Giacalones rented the property to strangers, (2) the Giacalones advertised the property for rent to the public, and (3) the Giacalones performed substantial repairs and improvements to the Property. Pl. Opp'n at 4. As to the first two issues, the Giacalones did not start advertising the Property to members of the public until July of 2010, Barbery Decl. ¶ 3; V. Giacalone ¶ 10, almost a year after GES incurred withdrawal liability. "[T]he crucial date for testing controlled group status is the date of withdrawal." *Lyons v. Raymond Rosen & Co.*, No. CIV. A. 93-1514, 1994 WL 129955, at *9 (E.D. Pa. Apr. 12, 1994) (citing *IUE AFL-CIO Pension Fund v. Barker & Williamson, Inc.*, 788 F.2d 118, 125 (3d Cir. 1986); *see also Cent. States, Se. & Sw. Areas Pension Fund v. CLP Venture LLC*, 760 F.3d 745, 749 (7th Cir. 2014) (finding that an entity was a member of the controlled group because the withdrawing employer owned a controlling interest *before* the date of withdrawal). Therefore, the Giacalones' modest advertising efforts, which took place approximately a year after the date of withdrawal, are of little moment to the Court's analysis.[3]

Next, plaintiffs seize on the fact that the Giacalones and Barbery spent "thousands" of hours "performing repairs and maintaining" the Property. Babu Decl. Exh. L, Interrog. No. 5. However, the types of improvements the Giacalones performed are not particularly instructive to the Court's inquiry. Replacing an old carpet and resurfacing a deck are repairs that might have

---

[3] In *Linquist* the court clarified that where the withdrawing employer is engaged in a leasing agreement with the controlled entity, it may not escape withdrawal liability as a "trade or business" simply by terminating the lease the day before the date of withdrawal. No. 10-3386 SC, 2011 WL 2884850, at *6. However here, it is undisputed that the Property was never leased to GES, and *Linquist* does not hold that facts occurring a year after the date of withdrawal are material to determining whether an entity is a "trade or business." Finally, a review of the rental records shows that the character of the property did not change after the Giacalones began offering it for rent to the public. The Giacalones received rental income of $48,300, $60,950, $73,100, and $48,600 in 2011, 2012, 2013, and 2014 respectively, with the property being rented between 55 and 82 nights a year. Babu Decl. Exh. I. A review of the guest logs also shows that a significant number of the guests stayed either for free or received a substantial discount, presumably for friends and family. *Id.*

been undertaken whether the Property was used as a residence, a passive investment or a bed and breakfast. A blanket rule which states that significant improvements to property necessarily require characterizing it as a "trade or business" could lead to perverse outcomes, such as allowing employers to escape withdrawal liability merely because they purchased newly renovated properties that require little upkeep. To the extent the facts surrounding the improvement and maintenance of the Property bear on the question of whether it constitutes a "trade or business," they are in equipoise.

The Giacalones and plaintiffs base their arguments on essentially the same evidence. Their dispute therefore arises not out of the presentation of conflicting facts, but rather centers on how these facts should be characterized. While plaintiffs wish to characterize the Property as a full-fledged business operation, they have failed to cite a single case holding that where there is no economic nexus with the withdrawing employer, occasionally renting residential property constitutes a trade or business.[4] In fact, in one case cited by plaintiffs, the court appears to suggest that a "vacation home rented out during the summer season to defray mortgages expenses" *would not* constitute a trade or business. *ILGWU Nat. Ret. Fund v. Minotola Indus., Inc.*, No. 88 CIV. 9131 (RJW), 1991 WL 79466, at *5 (S.D.N.Y. May 3, 1991).

Given the lack of economic nexus between the Property and GES, and the limited nature of the rental activity, the Court finds that, as a matter of law, the Property is not a "trade or business." As this Court and others have previously held, the "mere ownership of property without more is insufficient to constitute a 'trade or business.'" *Galletti* No. CV 13-3176 SI, 2013 WL 5289017, at *4. Accordingly, the Court **GRANTS** the Giacalones' motion for summary judgment, and **DENIES** plaintiffs' motion for summary judgment on the issue of whether the Property is a "trade or business."

---

[4] Moreover, many of the cases cited by plaintiffs employ the test for defining "trade or business" announced in *Commissioner of Internal Revenue v. Groetzinger*, 480 U.S. 23 (1987), which has been rejected by the Ninth Circuit. *See Lafrenz*, 837 F.2d 892; *see also Groetzinger* 480 U.S. at 27, nt. 8 ("We caution that in this opinion our interpretation of the phrase 'trade or business' is confined to the specific sections of the Code at issue here. We do not purport to construe the phrase where it appears in other places.").

**B.     Arbitration Requirement**

Plaintiffs argue that by failing to initiate arbitration, the Giacalones have waived the right to contest whether the Property is a trade or business under common control, and therefore an "employer" subject to withdrawal liability. Pl. Mot. at 8-9. As noted above, the MPAA defines "employer" to include, not only the entity making contributions to the plan, but also all "trades or businesses (whether or not incorporated) which are under common control" with the contributing employer. Under 29 U.S.C. § 1401(a)(1), "'[a]ny dispute over withdrawal liability as determined under [sections 1381 to 1399] shall be arbitrated.'" *Teamsters Pension Trust Fund-Board of Trustees v. Allyn Transp. Co.*, 832 F.2d 502, 504 (9th Cir. 1987). "If an employer fails to initiate arbitration, the employer waives the opportunity to assert any defenses that could have been raised before the arbitrator." *Pension Plan for Pension Trust Fund v. Weldway Constr., Inc.*, 920 F. Supp. 2d 1034, 1044 (N.D. Cal. 2013) (citing *Allyn*, 832 F.2d at 505). Plaintiffs read this provision as precluding the Giacalones from arguing that the Property is not a "trade or business," and therefore not an "employer" in a judicial forum.

As the court in *Tractor* noted, the plain language of the statute forecloses plaintiffs' argument. Section 1401 compels arbitration only for disputes arising out of sections 1381 through 1399, while controlled group status is determined under Section 1301. No. 13-CV-03703-WHO, 2014 WL 5810336, at *7; see also 29 U.S.C. § 1401. Although the Ninth Circuit has not yet directly addressed this issue,[5] this Court and several circuit courts have held that the issue of whether a defendant is a member of the controlled group, and therefore an "employer" within the meaning of the MPPAA, need not be arbitrated. *Galletti* No. CV 13-3176 SI, 2013 WL 5289017, at *2 (citing cases from the Second, Third, Eighth, and Eleventh Circuits). Accordingly, the Court finds that the Giacalones have not waived their right to contest whether the Property is a "trade or business" – and therefore a member of the controlled group – in a judicial forum.[6]

---

[5] In *Allyn*, the Ninth Circuit found that a control group member could be held responsible in default for the withdrawing party's liability where no arbitration was initiated. 832 F.2d at 506-07. However, in *Allyn*, the Court only addressed the issue of whether the notice to this member of the control group was sufficient, and not whether the member could challenge its status as an "employer" in the district court. *See id.*

[6] Nowhere in plaintiffs' two-page reply brief do they respond to the Giacalones'

10

**C. California Corporations Code § 2011**

On October 1, 2010, Vincent Giacalone received $369,450 in equipment from GES, which, according to plaintiffs, he later sold. Babu Decl. Exh. M. Vincent Giacalone also received $286,360.3 in proceeds from GES' insurance account. *Id.* Exh. N. Plaintiffs argue that these funds did not constitute repayment of a debt, but are rather equity distributions,[7] and seek to recover these funds from the Giacalones pursuant to California Corporations Code § 2011(a)(1)(B). Pl. Mot. at 8. Section 2011(a)(1)(B) states:

> (a)(1) Causes of action against a dissolved corporation, whether arising before or after the dissolution of the corporation, may be enforced against any of the following:
> …
> (B) If any of the assets of the dissolved corporation have been distributed to shareholders, against shareholders of the dissolved corporation to the extent of their pro rata share of the claim or to the extent of the corporate assets distributed to them upon dissolution of the corporation, whichever is less."

Cal. Corp. Code § 2011(a)(1)(B).

The Giacalones contend that Section 2011 does not apply because GES' corporate status is merely suspended, not dissolved.[8] Babu Decl. Exh. A. By its plain language, the statute applies exclusively to dissolved corporations. *See Gibble v. Car-Lene Research, Inc.*, 67 Cal. App. 4th 295, 310 nt. 11 (1998) ("Certainly, Corporations Code section 2011…applies only to 'dissolved' corporations."). In their reply, plaintiffs make an appeal to public policy, arguing that GES has

arguments, or otherwise address the issue of arbitration.

---

[7] It is wholly unclear from the evidence before the Court whether the transactions plaintiffs describe constitute a distribution of equity or a repayment of debt.

[8] It appears GES corporate status was suspended for failure to pay taxes. Def. Opp'n at 4. "Where the rights and privileges of a corporation are suspended for failure to pay franchise taxes, it is [not] treated as having been dissolved or its corporate franchise 'forfeited,' but it is merely subjected to certain disabilities unless and until it is 'revived' by the payment of the back taxes and penalties." Marsh's California Corporation Law § 21.15 (2015).

ceased business operations and is therefore functionally dissolved, even if it has not met the legal requirements for dissolution. In their view, shareholders should not be able to avoid section 2011 liability by winding up operations, but simply opting not to formally dissolve the corporation. Pl. Rep. at 2. Therefore, the question the Court must resolve is whether section 2011 provides a remedy against the shareholders of a corporation that has not been dissolved *de jure*, even if dissolved *de facto*. Neither party cites any case that bears on this inquiry.

In *CB Richard Ellis, Inc. v. Terra Nostra Consultants*, 230 Cal. App. 4th 405 (2014), the court of appeals addressed the analogous question of whether plaintiffs could avail themselves of a statute which provided a cause of action against the members of a dissolved limited liability company ("LLC"), even though the LLC had not met the statutory requirements for dissolution. The court held that "'[d]e facto' dissolution is an acceptable predicate to a claim under former section 17355, subdivision (a)(1)(B)." *Id.* at 415. In arriving at this conclusion, the court reasoned that "[t]he statute does not say there are no other potential causes of dissolution. Nor does the statute indicate that satisfaction of one of the three statutory events is the exclusive determinant of dissolution." *Id.* at 414. It ultimately based its holding on the very same policy concern expressed by the plaintiffs in this action. *Id.* at 415 ("If defendants' interpretation of the statutory scheme were correct, companies (and their members) could avoid the force of former section 17355, subdivision (a)(1)(B), by the simple expedient of transferring assets out of the company the day before voting to dissolve.")

This reasoning applies with equal force to section 2011, whose statutory language is almost identical to the provision analyzed in *CB Richard Ellis*.[9] Compare Cal. Corp. Code

---

[9] On June 23, 2015, the Court ordered the parties to be prepared to address *CB Richard Ellis* at oral argument, as neither party cited it in their briefs. At argument, the Giacalones argued that this case was distinguishable because its holding was animated by a concern that plaintiffs would be left without a remedy absent the doctrine of *de facto* dissolution. Conversely, they argue, that plaintiffs in this case could avail themselves of other statutory provisions that allow recovery of improper distributions to shareholders. However, this argument is belied by the plain language

§ 17707.07(a)(1) with § 2011(a)(1). While the Corporations Code sets forth various methods for effectuating the dissolution of a corporation, there is nothing to suggest that they are exclusive or that the Legislature meant to preclude the doctrine of *de facto* dissolution. See Cal. Corp. Code § 1900, *et seq*. Indeed, the statutory framework evinces a concern that shareholders may make improper distributions during the process of winding up, but before dissolution. See e.g. Cal. Corp. Code § 2009. The Court therefore finds that a cause of action under section 2011 may lie against the shareholders of a corporation that is dissolved "*de facto*."[10] This conclusion is also supported by the Ninth Circuit's interpretation of federal tax law, which has elevated substance over form as it relates to determining dissolved status. *A B C Brewing Corp. v. Commissioner of Internal Revenue*, 224 F.2d 483, 488 (9th Cir. 1955) ("if it appears that the corporation is a corporation in name and semblance only, without corporate substance and serving no real corporate purpose, it must, though not formally dissolved, be treated as dissolved *de facto*.") (internal citations and quotations omitted).

However, the determination of section 2011's scope does not end the Court's inquiry. It must also determine whether the Giacalones have raised any triable issue of fact as to (1) whether GES was dissolved *de facto*, and (2) whether the distributions made from GES to Vincent Giacalone were equity distributions, as plaintiffs suggest.

---

of the *CB Richard Ellis* decision, whose rationale rested on the court's understanding of the statute's purpose, rather than any perceived absence of an alternative adequate statutory remedy. 230 Cal. App. 4th at 414-15.

[10] In *Pacific Scene, Inc. v. Penasquitos, Inc.*, the California Supreme Court held that the California Legislature had "occupied the field" as it relates to causes of action against shareholders of dissolved corporations, and therefore "precluded…the provision of extra-statutory relief." 46 Cal. 3d 407, 413 (1988). "Once the Legislature has evinced an intent to comprehensively define the contours of a particular field, however, such complex policy determinations must plainly remain beyond the reach of our equitable jurisdiction." *Id.* at 413-14. However, in *Pacific Scene* the court was primarily concerned with judicial implementation of common law remedies that conflicted with the statutory framework. In this case, the concept of *de facto* dissolution advances the public policy the Legislature meant to further when it enacted section 2011.

As to the first issue, it does appear that GES was no longer conducting business operations at the time of the distributions. V. Giacalone Decl. ¶ 6 ("By 2010, GES was out of business."). As to the second issue, the evidence submitted by the parties falls short of conclusively demonstrating the nature of the distributions that Vincent Giacalone received. Therefore this issue is not amenable to summary judgment. Accordingly, the Court **DENIES** plaintiffs' motion for summary judgment on the issue of whether the Giacalones are liable under section 2011 for distributions received.

### D. Conclusion

The parties' motions for summary judgment are asymmetrical. While both moved for summary judgment on the issue of whether the Property constitutes a "trade or business," only plaintiffs moved for summary judgment on their claim under section 2011. Therefore, on the issue of whether the Property is a "trade or business" under ERISA as amended by the MPPAA, the Court **GRANTS** the Giacalones' motion and **DENIES** plaintiffs' motion. As to plaintiffs' claim arising under section 2011 of the Corporations Code, the Court **DENIES** plaintiffs' motion.

## II. Default Judgment

Defendant GES has failed to appear in this case, or otherwise respond to plaintiffs' allegations. On August 14, 2013, plaintiffs filed a motion to enter default against GES. Docket No. 21. On August 21, 2013, the Clerk entered default against GES. Docket No. 22. On May 1, 2015, plaintiffs filed a motion for default judgment against GES, requesting damages for assessed withdrawal liability, liquidated damages, attorneys' fees and costs, and interest totaling $3,411,525.72. Docket No. 89 at 1.

Default judgment does not flow automatically from the Clerk's entry of default, but is rather a matter reserved to the district court's sound discretion. *Draper v. Coombs*, 792 F.2d 915,

925 (9th Cir. 1986). In the Ninth Circuit, courts are guided by the eponymously named *Eitel* factors in determining whether entry of default judgment is appropriate. "Factors which may be considered by courts in exercising discretion as to the entry of a default judgment include: (1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits." *Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986). Upon entry of default, the well-pleaded allegations pertaining to liability are taken as true. *TeleVideo* 826 F.2d at 917-18.

Upon reviewing the *Eitel* factors, the Court finds that default judgment is appropriate. As to the first factor, the possible prejudice to plaintiffs is high, as they would be left without a remedy for assessed withdrawal liability absent a default judgment. As to the second and third factors, plaintiffs complaint properly alleges the elements of the causes of action it seeks to prevail upon. *See Kloepping v. Fireman's Fund*, No. C 94-2684 TEH, 1996 WL 75314, at *2 (N.D. Cal. Feb. 13, 1996) ("The Ninth Circuit has suggested that [these two factors] require that [the] plaintiffs' allegations state a claim on which the plaintiff may recover.") (internal quotations omitted). As to the fourth factor, while the sum of money at stake in this case is certainly not insignificant, it is also not disproportionate to the scale of GES's business operations or to the seriousness of its alleged conduct. *See TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915 (9th Cir. 1987) (district court did not abuse its discretion by striking the answer and entering $11.1 million default judgment against defendant as a sanction for committing perjury and filing false pleadings.). As to the fifth factor, there is a low possibility of dispute concerning material facts because upon entry of default all well-pleaded facts relating to defendants' liability are taken as true. *TeleVideo* 826 F.2d at 917-18. As to the sixth factor, there is nothing in the record to suggest that GES's absence is due to excusable neglect. If anything, GES's absence is likely a response to

the indisputable liability-conferring evidence presented against it.

The final factor is the only one which weighs against entering default judgment. "[T]he general rule [is] that default judgments are ordinarily disfavored. Cases should be decided upon their merits whenever reasonably possible." *Eitel*, 782 F.2d at 1472. However, "this preference, standing alone, is not dispositive." *PepsiCo, Inc. v. California Sec. Cans*, 238 F. Supp. 2d 1172, 1177 (C.D. Cal. 2002) (internal quotations omitted). Here, the Court cannot find that this final factor outweighs the other six, all of which militate in favor of entry of default judgment.

In ERISA cases, once it is established that the defendant employer has failed to become current on its withdrawal liability obligations, the Court *must* award the prevailing party attorneys' fees, interest on unpaid contributions, and an amount equal to the greater of liquidated damages or interest on unpaid contributions. See 29 U.S.C. §§ 1132, 1451; *see also Trustees of Amalgamated Ins. Fund v. Geltman Indus., Inc.*, 784 F.2d 926, 932 (9th Cir. 1986). Accordingly, the Court finds that GES is liable to plaintiffs for damages in the following amounts: (1) $2,231,762 in assessed withdrawal liability, (2) $560,079.04 in interest, (3) liquidated damages of $560,079.05, (4) reasonable attorneys' fees of $55,370, (5) reasonable costs of $4,235.64, for an amount totaling $3,411,525.72.

### III. Motion to Seal

With the exception of a narrow range of documents that are "traditionally kept secret," courts begin their sealing analysis with "a strong presumption in favor of access." *Foltz v. State Farm Mut. Auto. Ins.*, 331 F.3d 1122, 1135 (9th Cir. 2003). "A stipulation, or a blanket protective order that allows a party to designate documents as sealable, will not suffice to allow the filing of documents under seal." Civ. L.R. 79-5(a). When applying to file documents under seal in connection with a dispositive motion, the party seeking to seal must articulate "compelling reasons supported by specific factual findings that outweigh the general history of access and the public policies favoring disclosure, such as the public interest in understanding the judicial process." *Kamakana v. City and County of Honolulu*, 447 F.3d 1172, 1178-79 (9th Cir. 2006) (internal

quotations and citations omitted). Where a party seeks to seal documents attached to a non-dispositive motion, a showing of "good cause" under Federal Rule of Civil Procedure 26(c) is sufficient. *Id*. at 1179-80; *see also* Fed. R. Civ. P. 26(c). In addition, all requests to file under seal must be "narrowly tailored," such that only sealable information is sought to be redacted from public access. Civ. L.R. 79-5(b). Because a motion for summary judgment is a dispositive motion, the "compelling reasons" standard applies here. *See, e.g., In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. M02-1486PJH, 2007 WL 707499, at *1 (N.D. Cal. Mar. 6, 2007).

The parties have filed a motion to seal in conjunction with their motions for summary judgment. Docket No. 93. The motion seeks to redact personal identifying information from financial documents such as bank statements and tax records, as well as the names of individuals who rented the Property (non-parties to this action) as indicated on the rental logs. The Court finds that the parties have sufficiently articulated compelling reasons to render this information sealable and have narrowly tailored their request such that only sealable information has been redacted. Accordingly the Court **GRANTS** the parties motion to seal.[11]

**IT IS SO ORDERED.**

Dated: June 29, 2015

SUSAN ILLSTON
United States District Judge

---

[11] The parties failed to comply with the Local Rules which require that the "[t]he unredacted version must indicate, by highlighting or other clear method, the portions of the document that have been omitted from the redacted version, and prominently display the notation." L.R. 79-5(d)(1)(D). Failure to comply with this provision creates an administrative burden by making it difficult for the Court to discern the content of the material the parties wish to seal. The parties failed to remedy their filings even after the clerk contacted them to request updated copies that complied with the Local Rules. Given the relatively limited nature of the redactions, the Court was able to review the documents as they were submitted. However, the Court cautions the parties that future failure to comply with the Local Rules will result in denial.